ACCEPTED
15-25-00148-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
12/11/2025 8:21 AM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00148-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
12/11/2025 8:21:03 AM
CHRISTOPHER A. PRINE
Clerk

# In the Court of Appeals for the Fifteenth Judicial District

# Houston, Texas

---

TEXAS EDUCATION AGENCY,
*Appellant,*

v.

EXCELLENCE 2000, INC. AND SHERWIN ALLEN,
*Appellees.*

---

On Appeal from the
125th Judicial District Court, Harris County, TX
Cause No. 2022-55524

---

## APPELLANT'S REPLY BRIEF

---

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil
Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

**JOE NWAOKORO**
Texas Bar No. 24032916
Assistant Attorney General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
512.463-2120 | Fax: 512.320.0667
joe.nwaokoro@oag.texas.gov

**COUNSEL FOR APPELLANT**
**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES................................................................................... iii

INTRODUCTION ..............................................................................................1

ARGUMENT .....................................................................................................2

    I.      Appellee Did Not and Cannot Establish a Waiver of TEA's Sovereign Immunity ................................................................................................2

      A.   Appellee Bears the Burden to Establish Jurisdiction ................................2

      B.   There Are No Disputed Jurisdictional Facts. ............................................4

      C.   The Properties Belong to the State by Law. .............................................10

    II.     Sovereign Immunity Has Not Been Waived for Plaintiff's Disguised Trespass to Try Title Claim. ....................................................................18

    III.   Even if this is not a disguised trespass to try title claim, Excellence failed to plead a valid takings claim to overcome TEA's sovereign immunity..........................................................................................23

      A.   TEA acted under the scope of a valid contract and did not possess the requisite 'intent to take' under its eminent domain powers. ...................24

      B.   TEA's actions did not result in a 'taking' of private property. ...............25

      C.   TEA did not acquire Excellence's property for public use under its eminent domain powers........................................................................27

      D.   No valid total-takings claim can be alleged when Excellence received economic benefits after filing suit. .........................................................28

PRAYER ........................................................................................................28

CERTIFICATE OF COMPLIANCE ..................................................................30

CERTIFICATE OF SERVICE .........................................................................31

# INDEX OF AUTHORITIES

**Cases**

*Bland Indep. Sch. Dist. v. Blue,*
  34 S.W.3d 547 (Tex. 2000) ......................................................................3

*Chambers-Liberty Counties Navigation District v. State,*
  575 S.W.3d 339 (Tex. 2019) ....................................................................4

*Dallas Area Rapid Transit v. Whitley,*
  104 S.W.3d 540 (Tex. 2003) ....................................................................2

*Federal Sign v. Texas Southern University,*
  951 S.W.2d 401 (Tex. 1997) ..................................................................24

*Gen. Servs. Comm'n v. Little-Tex Insulation Co.,*
  39 S.W.3d 591 (Tex. 2001) ..............................................................24, 25

*Hawk v. E. K Arledge, Inc.,*
  107 S.W.3d 79 (Tex. App. – Eastland 2003, pet. denied) ....................22

*Hearts Bluff Game Ranch, Inc. v. State,*
  381 S.W.3d 468 (Tex. 2012) ..................................................................24

*In re Excellence 2000, Inc.,*
  636 B.R. 475 (Bankr. S.D. Tex. 2022) .................................................20

*Kennedy Con., Inc. v. Forman,*
  316 S.W.3d 129 (Tex. App. – Houston [14th Dist.] 2010, pet. denied) .22

*King Ranch, Inc. v. Chapman,*
  118 S.W.3d 742 (Tex. 2003) ..................................................................23

*KMS Retail Rowlett, LP v. City of Rowlett,*
  593 S.W.3d 175 (Tex. 2019) ..................................................................27

*Martin v. Amerman,*
  133 S.W.3d 262 (Tex. 2004) ..................................................................23

*Mission Consol. Ind. School Dist. v. Garcia*,
372 S.W.3d 629 (Tex. 2012) ....................................................................3

*Odyssey 2020 Academy, Inc. v. Galveston Central Appraisal Dist.*,
585 S.W.3d 530 (Tex. App. – Houston [14th Dist.] 2019, no pet)
........................................................................ .......11, 16, 17, 25

*Sani vs. Powell,*
153 S.W.3d 736(Tex. App. - Dallas 2005, pet. denied)........................22

*State v. Lain*,
349 S.W.2d 579 (Tex. 1961) ...............................................................22, 23

*State v. Lueck*,
290 S.W.3d 876 (Tex. 2009) ....................................................................4

*Steele v. City of Houston*,
603 S.W.2d 786 (Tex. 1980) ...................................................................27

*Tex. Ass'n of Bus. v. Tex. Air Ctrl. Bd.*,
852 S.W.2d 440 (Tex. 1993)....................................................................2

*Tex. Nat. Res. Conservation Comm'n v. IT-Davy,*
74 S.W.3d 849 (Tex. 2002) ....................................................................23

*Tex. Parks & Wildlife Dep't v. Callaway,*
971 S.W.2d 145 (Tex. App. – Austin 1998, no writ)...........................23

*Texas Dept. of Parks & Wildlife v. Miranda,*
133 S.W.3d 217 (Tex. 2004) ....................................................................4

*Town of Shady Shores v. Swanson,*
590 S.W.3d 544 (Tex. 2019) ....................................................................3

*U.S. v. Mendoza,*
952 S.W.2d 560 (Tex. App. – San Antonio, 1997) ..............................27

**Statutes**

19 Tex. Educ. Code. §44.008 ..................................................................10

Tex. Educ. Code §12.106 .........................................................................17

Tex. Educ. Code §12.128 ................................................................. passim

**Rules**

Tex. R. App. P. 38.3 ................................................................................1

**Regulations**

19 Tex. Admin. Code §100.1091(a).........................................................11

19 Tex. Admin. Code §100.1091-1093........................................ 11, 12, 14

19 Tex. Admin. Code §100.1095................................................. 12, 15, 16

19 Tex. Admin. Code §100.1067(c).........................................................10

**TO THE HONORABLE COURT OF APPEALS**:

Appellant Texas Education Agency ("TEA") files this its Reply Brief, pursuant to Rule 38.3 of the Texas Rules of Appellate Procedure, and asks this Court to reverse the trial court's order denying its plea to the jurisdiction and dismiss this case for want of jurisdiction, and respectfully shows as follows:

## INTRODUCTION

Excellence's response misstates the standard of review, ignores the record and the trial court's determination that there were no disputed jurisdictional facts, fashions a strawman argument, and fails to respond to key arguments negating jurisdiction. Its response confirms what TEA demonstrated in its plea to the jurisdiction: TEA's sovereign immunity deprived the trial court of subject-matter jurisdiction over Appellee's disguised trespass to try title claim. Even assuming it is not a disguised trespass to try title claim, Appellee failed to plead a viable takings claim and cannot invoke a waiver of immunity under the Takings Clause because the subject properties are State-owned by law, and TEA exercised its statutory and contractual rights under the Charter

1

Agreement ("Contract").

## ARGUMENT

### I. Appellee Did Not and Cannot Establish a Waiver of TEA's Sovereign Immunity

### A. Appellee Bears the Burden to Establish Jurisdiction

Preliminarily, Appellee misstates the standard of review in a plea to the jurisdiction, asserting in its response that "TEA failed to satisfy its burden to assert and support, with evidence, its contention that the trail court lacks subject matter jurisdiction." Appellee's Br. at 14. Not so. As the Supreme Court explained, "[i]n a suit against a governmental unit, the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity." *Dallas Area Rapid Transit v. Whitley,* 104 S.W.3d 540, 542 (Tex. 2003).

Plaintiff bears the burden of *alleging facts affirmatively demonstrating the court's jurisdiction. Tex. Ass'n of Bus. v. Tex. Air Ctrl. Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). Thus, Plaintiff bears the burden of establishing through its pleadings, and as appropriate, evidence of jurisdictional facts, that its claims against TEA are not barred by sovereign immunity. *See Mission Consol. Ind. School Dist. v. Garcia*, 372

S.W.3d 629, 635-38 (Tex. 2012) (explaining that a failure to properly plead and prove waiver deprived the trial court of jurisdiction).

Plaintiff further contends that "[i]n analyzing the defendant's plea to the jurisdiction, the court does not look at the merits of the plaintiff's case but considers only the pleadings and the evidence pertinent to the jurisdictional inquiry." Appellee's Br. at 14. It erroneously concludes that "TEA's arguments focus on the merits of the case," *id*, implying that whether the facts establish waiver of sovereign immunity is a merits question that should not be resolved in a plea to the jurisdiction. Plaintiff is again mistaken. Courts must resolve jurisdictional issues first, even if they are intertwined with the merits. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019). While some jurisdictional issues, such as personal jurisdiction and standing, can be resolved without reference to the merits, *see, e.g., Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000), overlap between jurisdictional issues and the merits is common in the sovereign-immunity context.

As the Supreme Court has also explained, "[t]he jurisdictional inquiry may unavoidably implicate substantive merits of the case when,

as often happens in *ultra vires* claims, the jurisdictional inquiry and the merits inquiry are intertwined." *Chambers-Liberty Counties Navigation District v. State*, 575 S.W.3d 339, 345 (Tex. 2019).

"[W]hen the facts underlying the merits and subject-matter jurisdiction are intertwined, the State may assert sovereign immunity from suit by a plea to the jurisdiction, even when the trial court must consider evidence 'necessary to resolve the jurisdictional issues raised.'" *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009) (citation omitted). Thus, when jurisdiction is challenged, the court is not required to solely review the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues, even if the jurisdictional and merits issues intertwine. *Texas Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 221-22, 227-28 (Tex. 2004).

## B. There Are No Disputed Jurisdictional Facts.

Excellence contends that disputed jurisdictional facts regarding the source of its funding to purchase the two properties preclude granting TEA's plea to the jurisdiction. Appellee's Br. at 7, 10. Misleadingly and without any record citation, Excellence claims that "the trial court properly denied TEA's second plea to jurisdiction as disputed material

fact issues remained." *Id.* at 10. The trial court made no such ruling. To the contrary, the trial court explicitly stated during the hearing that it no longer had a fact issue on whether State funds were used to purchase the property, particularly given Excellence's express admission in a previous lawsuit that it acquired the Houston property with state funds:

> THE COURT: Well, they're now saying that you've got a judicial admission that State funds were used for the purchase of the property. **And now I don't have a fact issue, I've got a judicial admission that says that in another case, another proceeding wherein your client took a different position**.
>
> MR. HOUSTON: Yeah.

4 RR. 13:15-21 (emphasis added).

In another exchange with Excellence's counsel, the trial court made it clear that there was no fact dispute on whether Excellence used state funds to acquire the Houston property:

> THE COURT: So real quick, I've got this line. In 2000, Excellence 2000 purchased land for a permanent Houston campus. The purchase price for the land was about $800,000. $145,000 was paid using private funds. And State funds were used to pay the remaining balance of about $565,000.
>
> MR. HOUSTON: Yeah.

THE COURT: **That seems to be pretty clear about how the purchase of the Houston campus was effectuated and the use of funds in order to pay for that**.

MR. HOUSTON: Right.

*Id.* 14:20-15:4 (emphasis added). Additionally, the court's order denying the plea, even after determining that it no longer had "a fact issue," provided no reasons. *See* 2 CR. 1332.

Materially, Excellence admitted in its prior lawsuit that it used state funds to acquire the Houston property: "The Houston property was purchased prior to September 1, 2001, and *partially paid for with non-public funds*." 1 CR. 250 (emphasis added). Excellence further conceded that, for the Houston property, "$145,000 was paid using private funds, and *state funds were used to pay the remaining balance of about $565,000.00*." 1 CR. 236 (emphasis added). There, Excellence claimed a "vested property interest in its deeds and the equity value of its real estate which is in excess of the amount of *state funds used to purchase the* lease [sic] *property*." 1 CR. 241 (emphasis added).

Furthermore, that Excellence sought to recover "the equity value … in excess of the amount of state funds used to purchase the … property,"

- 6 -

*id.*, is telling, recognizing that state funds were used to buy both properties. Pleadings in another case that are inconsistent with a party's position in a present action are evidence. Excellence's admission that these properties were assets of the charter school, and therefore, state assets, predated this lawsuit. Moreover, in its pleading below, Excellence admitted using state funds to purchase the properties, claiming that "TEA authorized charter schools to purchase private property using state funds." 2 CR. 1308.

Additionally, in the Application for *Private School Property* Tax Exemption for 2001-2002 ("Application") that Excellence submitted under penalty of perjury on April 11, 2002, to the Harris County Appraisal District for the Houston property, it represented that the Houston property was a charter school asset that would revert to the state once the charter school discontinued. 1 CR. 329-387 (emphasis added). The Application's title is instructive: it is an application for *private school property* tax exemption. *Id*. Excellence attached the Contract to the Application and would not have done so if it were its private property. Excellence also checked "yes" to the question: "Do these

documents [the Charter Agreement] direct that on the discontinuance of the school the school's assets are to be transferred to the State of Texas...." *Id.* at 332.

Regarding the Dallas property, TEA's investigative report of November 17, 2014, cited Excellence for violating Section 36 of the Contract upon discovering a recording of personal ownership interest in the charter school's property.[1] 1 CR. 220-221; 292-316. TEA's authority was not questioned, nor did anyone contend that the Dallas property was privately owned; instead, the breach was promptly cured by reconveying the property to Excellence. 1 CR. 310-316. The deed would not have been transferred back to Excellence to remedy the breach were it not a charter school asset. Tellingly, Excellence's brief fails to rebut this argument. *See* generally, Appellee's Br.

Further, at the hearing on the plea to the jurisdiction, Excellence conceded using state funds to acquire these properties. 4 RR. 13:8-14:25.

---

[1] Section 36 of the Contract required Excellence to maintain "title or other legal instrument granting to Charterholder the right to occupy and use one or more facilities suitable for use as the charter school facilities described by the charter." *See* 1 CR. 293.

These admissions are fatal and negate its claim that the source of funding is disputed.

In its response, Excellence equivocates, alternately clinging to its claim that it purchased the properties with personal funds, notwithstanding its previous admissions, and at the same time seeking to explain that it was authorized to use state funds. This is a simple question of whether it used state funds or not. In the court below and in a prior lawsuit, it answered that question affirmatively and unequivocally: it used state funds.

Amazingly, Excellence also seeks to distance itself from its own audit reports that showed that it had zero personal assets and used State funds to acquire the properties, claiming: "All erroneous calculations or statements therein which references state funds being used to purchase property are highly contested and disputed by the TEA Snapshots and Actual Financials of Excellence 2000." Appellee's Br. at 17. Charterholders are required to submit Audited Financial Reports ("AFRs") to the TEA each year that reflect the receipt of funds from all sources and the use of the funds pursuant to Tex. Admin. Code

§100.1067(c)[2]: "The charter holder shall file a copy of the annual audit report, approved by a charter holder, with the Texas Education Agency (TEA) division responsible for school financial audits not later than the deadline specified by TEC, §44.008."  The financial records that Excellence now implies, without any support, that they were "erroneous," covered several years and were approved by its board, as required by law – the charter holder must file an annual audit "approved by a charter holder."  19 Tex. Admin. Code §100.1067(c).

The AFRs reflect funds received by Excellence and usage of the funds, and include statements approved and submitted by Excellence, reflecting 100% state ownership interest in these properties.  1 CR. 221-222; 392-676; 2 CR. 678-976.  Accordingly, the fact that Excellence used state funds to acquire the properties may not reasonably be disputed.

## C. The Properties Belong to the State by Law.

Excellence fares no better in its argument that "prior to 2001, TEA permitted charter schools, such as Excellence 2000, to use state funds to purchase real property without that property considered as state

---

[2] This requirement was previously in Tex. Admin. Code §100.1063(f).

property." Appellee's Br. at 17, citing 19 Tex. Admin. Code §100.1091-1093 and *Odyssey 2020 Academy, Inc. v. Galveston Central Appraisal Dist.*, 585 S.W.3d 530 (Tex. App. – Houston [14th Dist.] 2019, no pet). Excellence makes little effort to address TEA's arguments referencing Section 12.128 of the Texas Education Code. Its reliance on the Texas Administrative Code §§ 100.1091-1093 is mistaken, as shown below.

Section §100.1091(a) provides:

Public property. An interest in real estate or personal property acquired, improved, or maintained using state funds that were received by the charter holder on or after September 1, 2001, is public property for all purposes under state law. The date on which the property was acquired, improved, or maintained is not determinative. An interest in real estate acquired, improved, or maintained using state funds that were received by the charter holder before September 1, 2001, is public property only to the extent specified by §100.1093 of this title (relating to Property Acquired with State Funds Received Before September 1, 2001- - Special Rules).

19 Tex. Admin. Code §100.1091(a). Thus, contrary to Excellence's contention, any interest in real estate acquired using state funds that were received on or after September 1, 2001, is state property; the date of acquisition is immaterial. If the property is acquired, improved, or

maintained with funds received before September 1, 2001, the asset is still public property but only as specified by Section 100.1093.

Section §100.1091(d) states:

> Ownership of public property. Public property is owned by the charter holder, regardless of the funds used to acquire it. Subject to the requirements of §100.1095 of this title (relating to Possession and Control of the Public Property of a Former Charter Holder) and this section, a charter holder retains all title to the property, exercises complete control over the property, and is entitled to all use and benefit from the property.

19 Tex. Admin. Code §100.1091(d). It clarifies that public property is owned by the charter holder, regardless of the funds used to acquire it. The charter holder retains all title to the property and exercises all control, subject to the provisions of Section 100.1095. Thus, Excellence retains title while it is a charterholder, but as Section 100.1095 shows below, the title reverts to the state once the charter terminates, and TEA is obligated legally to repossess the public property.

Section 100.1093 provides:

> (a) Non-public property.
>   (1) An interest in personal property acquired, improved, and maintained solely using state funds that were received by the charter holder before September 1, 2001, is non-public property. If any part of the state funds used were received on

or after September 1, 2001, then subsection (b) of this section applies to that property.

(2) An interest in real estate acquired, improved, and maintained using less than 50% state funds is non-public property if all state funds used were received before September 1, 2001. If any part of the state funds used were received on or after September 1, 2001, then subsection (b) of this section applies to that property.

(3) Non-public property under this section is exempt from §100.1091 and §100.1095 of this title (relating to Use of Public Property by a Charter Holder and Possession and Control of the Public Property of a Former Charter Holder). However, non-public property under this section must be included in the exhibit required by §100.1091(f) of this title.

(b) Public property.

(1) An interest in real estate acquired, improved, or maintained using 50% or more state funds is public property, even if all the state funds used were received by the charter holder before September 1, 2001.

(2) An interest in real estate acquired, improved, or maintained partly using state funds received on or after September 1, 2001, and partly using state funds received before September 1, 2001, is public property.

(3) An interest in personal property acquired, improved, or maintained partly using state funds received on or after September 1, 2001, and partly using state funds received before September 1, 2001, is public property.

(4) Public property under this section is subject to §100.1091 of this title.

(5) Public property under this section is subject to §100.1095 of this title only to the extent it was acquired, improved, or maintained using state funds received on or after September 1, 2001.

19 Tex. Admin. Code §100.1093. Section 100.1093 (a) provides that an interest in personal property acquired, improved, or maintained using state funds received before September 1, 2001, is personal property, but if state funds received after September 1, 2002, were used, then it is state property. *Id.* Section (b) clarifies that an interest in real estate acquired, improved, or maintained using 50% or more state funds is public property, even if all the state funds were received before September 1, 2001. It further states that an interest in real property acquired, improved, or maintained partly using state funds received after 2001, and partly with state funds received before September 1, 2001, is state property. *Id.*

For the Houston property, for example, Excellence claims that "$145,000 was paid using private funds, and state funds were used to pay the remaining balance of about $565,000.00." 1 CR. 236. Excellence also submitted Sherwin Allen's ("Allen") affidavit in 2016 stating that "[t]he Houston property was … partially paid for with non-public funds." 1 CR. 250. Even if Excellence contributed $145,000 of its private funds to acquire the Houston property (which is denied), $565,000.00 is obviously

more than 50% of the purchase price; the property was acquired on November 29, 2001, for $695,000.00, and the Dallas property in 2007. *See* 1 CR. 288-289, 339-341, 370; *see also* Appellee's Br. at 9.

Additionally, Section §100.1095(a), relating to the possession and control of the public property of a former charter holder, states in part:

> Disposition of audited property. The commissioner of education shall take possession, assume control, and supervise the disposition of the public property disclosed by the annual audit report as filed with the Texas Education Agency (TEA) or as revised pursuant to subsection (b) of this section.

19 Tex. Admin. Code §100.1095(a). As stated above, Excellence's AFRs – its audit reports – undeniably show that the properties are state assets. Section 100.1095(a) expressly authorizes TEA to "take possession, assume control, and supervise the disposition of the public property disclosed by the annual audit report" that Excellence filed with TEA. *Id*. That is exactly what TEA has done.

To the extent that Excellence now suggests, without any support or citation to the record, that the AFRs that it approved and submitted to TEA over several years, is now defective (Appellee's Br. at 17) – which is confounding because Excellence relies on the same AFRs to argue that

state funds were used "for educational purposes only and no state funds were used to purchase property", *id.* at 9 – that argument also fails because Section 100.1095(b) authorizes TEA to take measures to "take possession and assume control of all property of the former charter holder." 19 Tex. Admin. Code §100.1095(b). Moreover, a defective audit report is a report that is not substantially compliant with Section 100.1091(f). *Id.*

As the agency tasked with enforcement, TEA would have to determine whether an audit report is substantially compliant. Excellence's suggestion of "erroneous calculations or statements," Appellee's Br. at 17, is frivolous and nonsensical. In either event, the outcome is the same: TEA is authorized to take possession of the property of a former charter holder as disclosed by the annual audit report. Thus, even if this is not a camouflaged trespass to try title, Excellence has not and cannot plead a valid takings claim because TEA was fulfilling its legal obligation to regain possession of a State asset.

Finally, Excellence's reliance on *Odyssey 2020 Academy, Inc.,* 585 S.W.3d 530, hardly advances its cause. In *Odyssey*, plaintiff Odyssey

2020 Academy, Inc., an open-enrollment charter school, appealed from a summary judgment denying it an ad valorem tax exemption. *Id.* at 531. The plaintiff relied on section 12.128(a) of the Texas Education Code to argue that it was entitled to a tax exemption because it relied on the State for its funding and lease payment. *Id.* at 532.

Instructively, the court held that Section 12.128 of the Texas Education Code "comes into play when a school charter is revoked." *Id.* at 535. "Upon revocation of a charter, section 12.128 requires the seizure of charter school property 'purchased or leased with funds received by a charter holder under Section 12.106 after September 1, 2001.' Section 12.128 does not speak to tax exemptions as to leased property during the period a charter remains active." *Id.* (citation omitted). Likewise, as the *Odyssey* court noted, section 12.128 of the Texas Education Code provides that property purchased with state funds received by a charter holder after September 1, 2001 "(1) is considered to be public property for all purposes under state law; (2) is property of this state held in trust by the charter holder for the benefit of the students of the open-enrollment charter school; and (3) may be used only for a purpose for which a school

district may use school district property." Tex. Educ. Code § 12.128(a). As noted above, Excellence has not even bothered to rebut TEA's arguments that rely on section 12.128 of the Texas Education Code. *See generally*, Appellee's Br.

## II. Sovereign Immunity Has Not Been Waived for Plaintiff's Disguised Trespass to Try Title Claim.

Plaintiff argues that this is not a trespass to try title case because "[t]he title to the two properties are not in dispute in this case." Appellee's Br. at 15. The essence of a *disguised* claim is precisely that: to cloak one claim as something else. Plaintiff's bald claim that title is not in dispute is belied by the record. Remarkably, Plaintiff's response makes no effort to rebut the substantial records that TEA cited in its brief. *See* Appellant's Br. at 17-18.

Plaintiff does not deny that this lawsuit marks Plaintiff's third litigation with TEA over ownership of these same properties. As stated in TEA's opening brief, the ownership dispute long predated this lawsuit. *Id.* Excellence conceded in its 2016 lawsuit that TEA claimed ownership of these properties. 1 CR. 237-238, 250. Plaintiff alleged in that lawsuit that it "was directed to execute[] deeds to the property in favor of the

Texas Education Agency and to turn over all keys to the buildings, vehicles, and other similar property," 1 CR. 238, and that "[TEA] has persisted in demanding that Excellence 2000, Inc. execute deeds to both the Dallas and Houston properties to TEA *claiming the buildings are now 'owned' by TEA*." 1 CR. 240 (emphasis added). It further alleged that it had asserted a takings claim, alleging that TEA "seize[d] virtually all of Plaintiff's property and asserts and declare[d] them to be solely the public property of the State of Texas without just compensation...." *Id.* at 240-41.

Excellence also conceded in its Chapter 11 bankruptcy that ownership of these properties was disputed. 1 CR. 215, 255-260; 2 CR. 1246-1249. One of the motions it filed, "Debtor's Unopposed Emergency Motion to Continue Hearing on Ownership and Title," acknowledged that ownership of these properties was disputed:

> 1. This Court had set the hearing *on the title and ownership of the school properties* of the Debtor for Wednesday, December 8, 2021, for 9:00 am.
> …
> 3 This matter involves the *ownership of real properties located in Houston and Dallas. The TEA claims it is the rightful owner of the properties by virtue of providing funds to Excellence 2000. Excellence 2000 claims it is the owner of*

*the properties.*

2 CR. 1246-1249 (emphasis added).

Another motion it filed, "Emergency Motion for Debtor to Extend Date to File Chapter 11 Plan of Reorganization," also stated that ownership of the property was disputed, stating in part:

> 9. *If the State of Texas owns the Properties*, then the Debtor cannot use the Properties in its reorganization. Further, there may be no need for a reorganization if the State of Texas owns the Properties.
> 10. *The ownership of the Properties is the critical issue in this case. If the Debtor owns the Properties*, then it should be able to assume control and move forward on its reorganization.
> . . .
> 14. *Until ownership is determined, the case is effectively "on hold."*
> 15. While the Debtor could file a plan, the plan will depend on ownership. If the State is ultimately determined to own the Properties, then the plan may not and probably is not necessary.

1 CR. 256-260 (emphasis added). Thus, Plaintiff's pleadings in bankruptcy court flatly acknowledged that title was disputed. Further, the bankruptcy court's order denying one of Excellence's motions reiterated that ownership was disputed. *In re Excellence 2000, Inc.*, 636 B.R. 475, 480-81 (Bankr. S.D. Tex. 2022).

Plaintiff's pleadings in this case also unambiguously demonstrate that title is disputed. In its pleadings below, Plaintiff conceded that ownership of these properties is disputed, acknowledging that "*there is a fact issue as to ownership* and what funds were used to purchase the two properties." 1 CR. 49 (emphasis added). "The *crux of immunity claim lies in the ownership of two properties* Excellence 2000 purchased to operate its charter schools." 1 CR. 35 (emphasis added). "*TEA has long completed all administrative functions of closing the schools and now wrongfully alleges it owns the properties* instead of Plaintiff and denied Plaintiff access to the two properties. *Plaintiff disputes TEA's allegation that it owns the two properties* and filed suit." 1 SuppCR. 836 (emphasis added).

Plaintiff's repeated admissions erase any doubt that this is a trespass to try title claim. Because this case involves a dispute over ownership of real property, it is, in effect, a trespass to try title claim masquerading as a takings claim. Therefore, TEA retains immunity.

Further, in a hearing on TEA's first plea, the trial court distilled the issue to an *ownership dispute*: "If they spent the State's money to

bu[y] this property, then it's the State's. If they used their own money, then there's a question there that I have." 3 RR. 12:21-24.

Additionally, by its Plea, TEA has established the State's ownership of these two properties. That TEA claims a competing, superior ownership right effectively converts this to a title dispute. At its heart, this case is about ownership of two real properties.

Texas Supreme and Appellate Courts have repeatedly held that title determinations against the State are barred by sovereign immunity. *State v. Lain*, 349 S.W.2d 579 (Tex. 1961). "Any suit that involves a dispute over the title to land is, in effect, an action in trespass to try title, *whatever its form." Sani vs. Powell,* 153 S.W.3d 736, 745 (Tex. App. - Dallas 2005, pet. denied) (emphasis added); *see also Kennedy Con., Inc. v. Forman*, 316 S.W.3d 129, 135 (Tex. App. – Houston [14th Dist.] 2010, pet. denied) ("*Any suit involving a dispute over the title to land is an action in trespass to try title, whatever its form and regardless of whether legal or equitable relief is sought.*") (emphasis added); *see also Hawk v. E. K Arledge, Inc.*, 107 S.W.3d 79, 84 (Tex. App. – Eastland 2003, pet. denied).

Trespass to try title is "a procedure by which rival claims to title or right of possession may be adjudicated." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 755 (Tex. 2003). A trespass to try title action is "the method for determining title to … real property." *Martin v. Amerman*, 133 S.W.3d 262, 267 (Tex. 2004) (citation omitted).

Excellence's lawsuit is merely creative pleading to circumvent TEA's sovereign immunity. Its lawsuit is a disguised trespass to try title claim that is barred by sovereign immunity. *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855-56 (Tex. 2002). It is well-settled that a suit for title to real property of the State or one of its agencies may not be maintained without legislative consent. *Tex. Parks & Wildlife Dep't v. Callaway*, 971 S.W.2d 145, 152 (Tex. App. – Austin 1998, no writ). Excellence's takings claim requires trying the State's title to the disputed property, which is barred by sovereign immunity. *Lain*, 349 S.W.2d at 582. Therefore, this Court should reverse for lack of jurisdiction.

## III.  Even if this is not a disguised trespass to try title claim, Excellence failed to plead a valid takings claim to overcome TEA's sovereign immunity.

Excellence's response feebly responds to TEA's arguments that it failed to plead a viable takings claim to overcome TEA's sovereign

- 23 -

immunity. "In the absence of a properly pled takings claim, the state retains immunity." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012).

TEA argued in its opening brief that Excellence's pleadings fail to show, as a threshold issue, that TEA even has eminent domain powers to support its takings allegation. Appellant's Br. at 30. Excellence failed to respond to this argument. *See generally*, Appellee's Br.

Even if TEA has eminent domain powers, TEA did not acquire the properties for public use but rather reclaimed state property pursuant to Excellence's admissions and self-reported disclosures, consistent with Texas law, and under the Contract.

## A. TEA acted under the scope of a valid contract and did not possess the requisite 'intent to take' under its eminent domain powers.

"Texas courts have long recognized that the State wears two hats: the State as a party to the contract and the State as sovereign." *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 599 (Tex. 2001); *see also Federal Sign v. Texas Southern University,* 951 S.W.2d 401, 405 (Tex. 1997). When acting as a party to a contract, the State does

not have the 'intent to take' under its eminent domain powers. *Little-Tex Insulation Co.*, 39 S.W.3d at 599 (citation omitted). Such is the case here.

TEA argued in its opening brief that it lacked the requisite "intent to take" because it acted pursuant to the Contract. Appellant's Br. at 31-33. Excellence's response consists of a solitary sentence without any argument or meaningful analysis: "TEA's argument that Excellence 2000 consented to the two properties being taken under the charter school contract is disputed." Appellee's Br. at 17.

## B. TEA's actions did not result in a 'taking' of private property.

"Upon revocation of a charter, section 12.128 [of the Education Code] requires the seizure of charter school property 'purchased or leased with funds received by a charter holder under Section 12.106 after September 1, 2001.'" *Odyssey 2020 Academy, Inc.* 585 S.W.3d at 535 (citation omitted). As discussed above, if the open-enrollment charter school later ceases to operate, Section 12.128 requires TEA to "take possession and assume control" of this public property. *Id.* § 12.128(c). That is exactly what TEA did here.

Tellingly, Excellence makes no effort to rebut this argument besides its conclusory claim that it purchased the properties with personal funds – a claim belied by its admission and affidavit to the contrary. Because both properties were purchased post-September 1, 2001, and Excellence had already been receiving state funds before their acquisition, the presumption is that the properties are public property; public property does not fall under the purview of a 'taking.' Tex. Educ. Code § 12.128(a). Excellence has still failed to rebut this presumption.

Furthermore, after repeatedly claiming to have purchased the properties with private funds (2 CR. 1008-1009, 1 CR. 42-43; 2 CR. 979, 1015; 2 RR. 8:11-9:15; 3 RR. 10:1-3) and introducing a sham affidavit to support its false claim (1 CR. 60-62), once confronted with its admission in its 2016 lawsuit that it purchased the properties with state funds, Excellence conceded that it indeed purchased the properties with state funds. 1 CR. 236 at ¶13; 1 CR. 250; 4 RR. 13:8-14:25. It now seeks to retract that binding admission by advancing a tortured argument, with zero evidence, that its prior admission and affidavit related to "conduct which occurred prior to September 1, 2001." Appellee's Br. at 17.

Significantly, as observed above, Excellence offers no evidence nor cites to the record to support this bald, contrived argument. Counsel's argument is not evidence. *U.S. v. Mendoza*, 952 S.W.2d 560, 564 (Tex. App. – San Antonio, 1997).

TEA properly determined that the properties are state property and repossessed them once Excellence's charter was revoked, as authorized by Section 12.128 of the Texas Education Code. Tex. Edu. Code §12.128. Because they are state property and TEA acted pursuant to the law, the properties were not taken, and Excellence's takings claim is jurisdictionally barred.

## C. TEA did not acquire Excellence's property for public use under its eminent domain powers.

"Property is taken for public use only when there results to the public some definite right or use in the business or undertaking to which the property is devoted." *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 186–87 (Tex. 2019) (internal quotations omitted). Public use is defined solely as *public works*. *Steele v. City of Houston*, 603 S.W.2d 786, 790 (Tex. 1980).

Excellence's response fails to rebut TEA's argument that it failed to establish the property was taken for "public use." This case has nothing to do with *public works*. Thus, Excellence has still failed to show that TEA acquired the properties for public use.

## D. No valid total-takings claim can be alleged when Excellence received economic benefits after filing suit.

Excellence's petition is predicated on a total-takings theory. 2 CR. 1266-1272. However, while it alleges full appropriation of the subject properties, Excellence continued to accrue benefits as an owner, notwithstanding the title dispute with TEA. After filing the instant lawsuit, Excellence, Allen, and his wife, Jeanette S. Allen, received fifty thousand dollars ($50,000) for an easement on the Houston property, 1 SuppCR. 888-893, thereby undercutting its total takings claim.

## PRAYER

For the foregoing reasons and those stated in its opening brief, this Court should reverse the judgment of the trial court below and dismiss this case with prejudice.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney
General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil

**KIMBERLY GDULA**
Chief, General Litigation Division

*/s/ Joe Nwaokoro*
**JOE NWAOKORO**
Assistant Attorney General
Texas Bar No. 24032916
General Litigation Division

Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Joe.nwaokoro@oag.texas.gov
(512) 463-2120/Fax (512) 320-0667

*ATTORNEYS FOR*
*DEFENDANT-APPELLANT*

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains 5,515 words, excluding parts exempted by Tex. R. App. P. 9.4 (i)(1).

/s/ *Joe Nwaokoro*
JOE NWAOKORO
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served electronically through the electronic filing manager in accordance with Tex. R. App. P. 9.5(b)(1) on the 11th day of December 2025, to:

Melvin Houston
3033 Chimney Rock, Suite 610
Houston, Texas 77056
mhouston@gotellmel.com

Nikeyla Johnson
3033 Chimney Rock, Suite 610
Houston, Texas 77056
njohnson@contactjohnsonlawfirm.com

*Counsel for Appellee*

/s/ *Joe Nwaokoro*
JOE NWAOKORO
Assistant Attorney General

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mary Sifuentes on behalf of Joseph Nwaokoro
Bar No. 24032916
mary.sifuentes@oag.texas.gov
Envelope ID: 108971187
Filing Code Description: Response
Filing Description: APPELLANTS REPLY BRIEF
Status as of 12/11/2025 8:31 AM CST

Associated Case Party: Excellence 2000, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Nikeyla Johnson | 24065505 | njohnson@contactjohnsonlawfirm.com | 12/11/2025 8:21:03 AM | SENT |
| Melvin Houston | 793987 | mhouston@gotellmel.com | 12/11/2025 8:21:03 AM | SENT |

Associated Case Party: Texas Education Agency

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Joe Nwaokoro | | Joe.Nwaokoro@oag.texas.gov | 12/11/2025 8:21:03 AM | SENT |
| Mary Sifuentes | | Mary.Sifuentes@oag.texas.gov | 12/11/2025 8:21:03 AM | SENT |